## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| *In re: The $uicideboy$ Trademark Litigation* | Civil Action Nos.<br>1:22-cv-03729-SDG<br>1:23-cv-03516-SDG<br>1:24-cv-03509-SDG |

## <u>OPINION AND ORDER</u>

These cases are before the Court on a *sua sponte* inquiry into personal jurisdiction. In October 2024, I appointed Paul Koster, Esq., the faculty advisor of the Emory Law School Supreme Court Advocacy Program (ELSSCAP), as *amicus curiae* to brief certain issues I raised.[1] In short, I asked ELSSCAP to address the following question: Can this Court constitutionally exercise personal jurisdiction over defendants who have been accused of trademark infringement but have no apparent connection to this district?[2] With the *amicus*'s helpful briefing in mind, I conclude that the exercise of personal jurisdiction in this district over served defendants is consistent with the Lanham Act, as amended by the Trademark Counterfeiting Act of 1984, as well as the Fifth Amendment to the United States Constitution.

---

[1]    Case No. 1:23-cv-03516, ECF 21; Case No. 1:24-cv-03509, ECF 48.

[2]    *Id.* at 3–4. Having reviewed the *amicus* brief, counsel for Plaintiffs informed the Court they did not believe Plaintiffs needed to file a separate response brief. The Court therefore relieved Plaintiffs of their obligation to do so. *See* Case No. 1:23-cv-03516, ECF 22; Case No. 1:24-cv-03509, ECF 59.

## I.    Background

Plaintiffs Scott Arcenaux, Jr. and Aristos Petrou are two halves of the music group "The $uicideboy$" (SSB), which has released two certified Platinum singles and four certified Gold albums since 2014.[3] A music critic described the sound of SSB's most recent album, *New World Depression*, as "rapid-fire flow, defined by thick Southern accents and sudden shifts from rapping to singing, harken[ing] back to Memphis horrorcore," with additional notes of "'90s New York hip-hop."[4] According to Billboard, as of October 2021 SSB's music had been streamed 5.3 billion times.[5] Consistent with its growing success, SSB—along with Plaintiff G59 Merchandising, Inc., the entity through which SSB markets and sells its

---

[3]    Compl., Case No. 1:22-cv-03729, ECF 1, ¶¶ 4–5, 11; Compl., Case No. 1:23-cv-03516, ECF 1, ¶¶ 4–5, 11; Compl., Case No. 1:24-cv-03509, ECF 1, ¶¶ 4–5, 11. Where possible, this Order will refer to the complaints collectively.

[4]    Steve Erickson, *$uicideboy$ 'New World Depression' Review: A Hard Pill to Swallow*, Slant Magazine (June 10, 2024), https://www.slantmagazine.com/music/suicideboys-new-world-depression-album-review/ [https://perma.cc/3D7J-KQVS].

[5]    Kristin Robinson, *How $uicideboy$ Became the Multi-Million Dollar Brand You Never Heard Of*, Billboard (Oct. 22, 2021), https://www.billboard.com/music/music-news/suicideboys-new-album-headlining-tour-2021-interview-9649488/ [https://perma.cc/7DD8-LGYT].

merchandise[6]—registered certain trademarks with the U.S. Patent and Trademark Office.[7]

SSB's popularity allowed it to embark on nationwide tours in 2022, 2023, and 2024, each of which had a stop in Atlanta, Georgia, within this district.[8] During each of those tours, Plaintiffs filed a complaint in this district seeking, among other things, an *ex parte* order pursuant to 15 U.S.C. § 1116 for the seizure of counterfeit SSB merchandise being sold in the vicinity of SSB's performances.[9] Further proving the point that there is nothing new under the sun:

> [SSB's] success has spawned a curious underground industry which capitalizes upon [its] popularity. According to the plaintiffs, there are a number of persons who show up at [SSB's] concerts with merchandise . . . .[10] The merchandise is sold outside the concert halls in which [SSB] is performing.[11]

---

[6]  Compl. ¶ 6. Between 2023 and 2024, G59 apparently changed from an LLC to a Florida corporation with its principal place of business in California. *Compare* Compl., Case No. 1:23-cv-03516, ECF 1, ¶ 6, *with* Compl., Case No. 1:24-cv-03509, ECF 1, ¶ 6.

[7]  Decl. of Dana Biondi, Ex. A, Case No. 1:22-cv-03729-SDG, ECF 2-4; Compl. Ex. A, Case No. 1:23-cv-03516, ECF 1-1; Compl. Ex. A, Case No. 1:24-cv-03509, ECF 1-1.

[8]  Compl. ¶ 17.

[9]  Compl. ¶¶ 18, 31.

[10]  Compl. ¶ 18.

[11]  *Id.*

[SSB], needless to say, has not given these entrepreneurs permission to use [its] name or [ ] likeness.[12] In fact, [SSB] has granted plaintiff [G59] the exclusive right to market such merchandise.[13] [G59] sells [SSB] merchandise inside the concert halls in which [SSB] is performing.[14] Obviously, the presence of the unauthorized vendors outside the concert halls hurts the sales of [G59's] merchandise and damages [SSB] . . . .[15]

Plaintiffs have asked the court to enjoin the sale of unauthorized [SSB] merchandise and to order the seizure of the counterfeit goods.[16] Plaintiffs invoke the federal Lanham Act, 15 U.S.C. s 1051 *et seq.* and various pendent state law causes of action in support of their claim.[17]

---

[12]  *Id.* ¶¶ 18–20.

[13]  *Id.* ¶ 6.

[14]  *Id.* ¶ 17.

[15]  *Id.* ¶ 32.

[16]  *Id.* ¶ 34.

[17]  *See generally id.*, Claims for Relief. In each case, Plaintiffs have also brought claims for violations of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372, and for unfair competition under Georgia common law. *Id.* Because I conclude that personal jurisdiction is proper for the federal Lanham Act claims, and the Georgia state law claims "arose from the same jurisdiction generating event," I can exercise personal jurisdiction over the entire case. *Cronin v. Washington Nat. Ins. Co.*, 980 F.2d 663, 671 (11th Cir. 1993). However, I have my doubts that liability can ultimately be imposed for the Georgia state law claims against defendants who had no contacts with the State. *See Am. Charities for Reasonable Fundraising Regul., Inc. v. Pinellas Cnty.*, 221 F.3d 1211, 1216 (11th Cir. 2000) (quoting *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 315 n.2 (1970) (Harlan, J., dissenting)) ("There must be at least some minimal contact between a State and the regulated subject before it can, consistently with the requirements of due process, exercise legislative jurisdiction."). However, the ultimate viability of Plaintiffs' state law claims against the served defendants will be addressed at the appropriate time.

*Joel v. Various John Does*, 499 F. Supp. 791, 792 (E.D. Wis. 1980).[18] According to

Plaintiffs, nearly 50 years later the song remains the same.

During the course of the cases filed by Plaintiffs in this district, I have on

several occasions granted temporary restraining orders (TROs) and *ex parte* seizure

orders,[19] pursuant to which Plaintiffs seized considerable amounts of counterfeit

SSB merchandise from alleged counterfeiters all over the country.[20] I have also

issued several preliminary injunctions against those defendants who were served

with the TROs, all of whom failed to appear for a show cause hearing.[21]

---

[18] The *Joel* opinion—the first published opinion addressing *ex parte* seizures under the Lanham Act, *see* Jules D. Zalon, *Ex Parte Seizure Orders: Don't Kill the Goose That Laid This Golden Egg!*, 23 Colum.-VLA J.L. & Arts 181, 183 (1999)—was recounting the battle between singer-songwriter Billy Joel, his exclusive merchandising company, and counterfeiters at his performances in 1980. *Joel*, 499 F. Supp. at 791–92. Notably, Zalon served as counsel for the *Joel* plaintiffs, *see id.* at 791 and takes credit for the widespread practice of naming John Doe defendants in *ex parte* seizure cases, *see* Zalon, *supra*, at 181 n.a1.

[19] *See, e.g.*, Sept. 20, 2022 TRO, Case No. 1:22-cv-03729, ECF 5; Aug. 16, 2023 TRO, Case No. 1:23-cv-03516, ECF 8; Aug. 9, 2024 TRO, Case No. 1:24-cv-03509, ECF 7.

[20] *See, e.g.*, Decl. of John T. Rose, Case No. 1:23-cv-03516, ECF 18-1, at ¶ 5 (listing the dates and places of service on defendants); Decl. of John T. Rose, Ex. A, Case No. 1:24-cv-03509, ECF 39 (Boston Police Department report stating that 43 counterfeit SSB shirts were seized from Defendant McKay).

[21] *See, e.g.*, Sept. 30, 2022 Prelim. Inj., Case No. 1:22-cv-03729, ECF 7; Sept. 22, 2023 Prelim. Inj., Case No. 1:23-cv-03516, ECF 13; Sept. 4, 2024 Prelim. Inj., Case No. 1:24-cv-03509, ECF 19.

However, none of these cases has been brought to judgment. In the 2022 case, I granted a preliminary injunction in September 2022, but there was no subsequent activity on the docket until July 2023, when Plaintiffs filed an amended complaint seeking relief related to their 2023 tour.[22] I directed Plaintiffs to file their complaint regarding the 2023 tour in a new case; I also dissolved the September 2022 preliminary injunction and directed the Clerk to close the 2022 case.[23]

Plaintiffs did open a new case for their 2023 tour, and after several months of proceedings I entered a preliminary injunction in November 2023.[24] At the accompanying show cause hearing, I ordered Plaintiffs to file a motion for default judgment against the served defendants or renew their motion for a TRO within 14 days.[25] Plaintiffs sought a Clerk's entry of default 19 days later but did not move for default judgment until I ordered them to do so in April 2024.[26] In their motions, Plaintiffs attest that 30 defendants were served in the 2023 case.[27]

---

[22]  Case No. 1:22-cv-03729, ECFs 7, 8.

[23]  *Id.*, ECF 11.

[24]  Case No. 1:23-cv-03516, ECF 17.

[25]  *Id.*

[26]  *Id.*, ECFs 18, 19, 20.

[27]  Decl. of John T. Rose, Case No. 1:23-cv-03516, ECF 18-1, ¶ 5. I note that in the subsequent motion for default judgment, Plaintiffs omitted Defendant Leroy Hill. *Id.*, ECF 20, ¶ 5.

On the eve of their 2024 tour, Plaintiffs opened a third case.[28] In the 2024 case, I entered several TROs and preliminary injunctions.[29] Plaintiffs attest that six defendants were served in the 2024 case.[30] Meanwhile, Plaintiffs' motion for default judgment in the 2023 case became ripe for decision.[31] However, in reviewing Plaintiffs' motion, I became concerned that the exercise of personal jurisdiction over defendants who are not present in this district might present constitutional concerns.

Because no defendants have appeared in any of these cases, no one has developed this argument to-date. Accordingly, I denied Plaintiffs' motion for default judgment without prejudice, pending a further evaluation of personal jurisdiction.[32] Having reviewed the excellent *amicus* brief filed by ELSSCAP and conducted significant additional independent research, I am now prepared to conclude that personal jurisdiction over the served defendants, whether present in this district or not, accords with the Lanham Act and the Fifth Amendment.

---

[28]  Case No. 1:24-cv-03509, ECF 1.

[29]  *Id.*, ECFs 7, 12, 19, 33, 37, 49.

[30]  Decls. of John T. Rose, Case No. 1:24-cv-03509, ECFs 15, 21, 34, 39.

[31]  Case No. 1:23-cv-03516, ECF 20.

[32]  *Id.*, ECF 25.

## II.    Discussion

This Order will proceed in four parts: (1) a brief review of the statutory history of the Lanham Act, as amended by the Trademark Counterfeiting Act of 1984, pursuant to which Plaintiffs seek relief; (2) an explanation of the practice and procedure for *ex parte* seizure orders under the Trademark Counterfeiting Act; (3) an analysis of the statutory and constitutional propriety of the exercise of personal jurisdiction over defendants located outside of this district; and (4) a clean-up of various outstanding items in the 2023 and 2024 cases.

### A.    A Brief History of the Trademark Counterfeiting Act of 1984

To better understand the journey of these cases, a bit of historical background is useful. The Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.*—often referred to as the Lanham Act in honor of its chief congressional champion, Rep. Fritz G. Lanham, *see* Sondra Levine, *The Origins of the Lanham Act*, 19 J. Contemp. Legal Issues 22, 27 (2010)—was "the culmination of more than seventy years of congressional forays into trademark territory." *Id.* at 22. After a patchwork set of disparate statutes, Supreme Court decisions, and congressional amendments resulted in a "crazy quilt of modifications and amendments" in federal trademark law, *id.* at 23 (quoting 1 *McCarthy on Trademarks and Unfair Competition* § 5:3 (5th ed.)), Rep. Lanham and other proponents marshaled the Trademark Act

through Congress to create a comprehensive, modernized, and simplified federal statutory scheme for trademarks, *see id.* at 26.

Approximately 40 years later, Congress modernized the Lanham Act once again with the Trademark Counterfeiting Act of 1984, 15 U.S.C. §§ 1116–18 (hereinafter, the TCA). In the intervening decades, Congress had observed a "mushrooming traffic in counterfeit goods and services." S. Rep. 98-526, at 2, *as reprinted in* 1984 U.S.C.C.A.N. 3627, 3628. In the eyes of Congress, this burgeoning but "uniquely pernicious" industry had "become increasingly callous towards the judicial process." *Id.* at 1, 2. And "traditional civil remedies proved ineffectual," as counterfeiters "would often destroy any counterfeit goods in their possession the moment they were placed on notice of legal proceedings," leaving trademark owners with few options for obtaining meaningful relief. Steven N. Baker & Matthew Lee Fesak, *Who Cares About the Counterfeiters? How the Fight Against Counterfeiting Has Become an in Rem Process*, 83 St. John's L. Rev. 735, 740 (2009). To illustrate the point, commentators interviewed two veteran trademark attorneys on their pre-TCA practice:

> The manner in which counterfeiters operate does not lend itself to standard civil remedies. The majority of counterfeiters are street vendors who peddle their goods at flea markets, city kiosks, and live entertainment events. These individuals and groups are usually not incorporated or otherwise formally organized. Instead, they tend to do business from remote, makeshift factories and storage centers. Their vans and trucks serve as

> 'moving warehouses' that travel from event to event, city to city, in search of unsuspecting consumers.
>
> If apprised in advance of a pending motion for injunction, counterfeiters invariably leave with their illicit merchandise and either relocate to a venue beyond the jurisdiction of the court or simply wait until their pursuers have abandoned the cause before restarting their illegal businesses.

Steven N. Baker, *The Never-Ending Seizure Order: How Courts Have Granted Immortality to Congress's Mayfly*, 26 Cardozo Arts & Ent. L.J. 369, 374 (2008) (quoting Lucas G. Paglia & Mark A. Rush, *End Game: The Ex Parte Seizure Process and the Battle Against Bootleggers*, 4 Vand. J. Ent. L. & Prac. 4, 5 (2002)).

This novel problem begat a "truly novel creation in the realm of private commercial litigation: An ex parte seizure process by which a trademark owner 'may obtain a court order directing a law enforcement official to seize counterfeit goods and related materials without giving advance notice to the party from whom the goods are seized.'" Baker & Fesak, *supra*, at 741 (quoting S. Rep. 98-526, at 6). Because these seizure orders allow civil plaintiffs to wield police-like power, courts and commentators have described them as "drastic, intrusive, and extraordinary relief that should be ordered only as a last resort." Gabrielle Levin, *Desperate Times, Desperate Measures? Reconceptualizing Ex Parte Seizure Orders to More Effectively Fight the War on Trademark Counterfeiting*, 14 U. Balt. Intell. Prop. L.J. 171, 176 (2006) (internal quotation marks and citations omitted). At the same

time, because of their capacity for immediate relief, these seizure orders have become "the 'premier weapon' against trademark counterfeiting." *Id.* at 175–76 (quoting 3 *McCarthy on Trademarks and Unfair Competition* § 25:13 (5th ed.)).

Before the TCA, some courts permitted *ex parte* seizures under the Lanham Act, despite the lack of an obvious textual hook. *See, e.g.*, *In re Vuitton et Fils S.A.*, 606 F.2d 1, 3 n.5 (2d Cir. 1979) (relying on the All Writs Act, 28 U.S.C. § 1651(a)); *Swatch Watch, S.A. v. Aste Trading Corp.*, No. 85 CIV. 7726 (MJL), 1986 WL 734, at *3 (S.D.N.Y. Jan. 3, 1986) ("Prior to enactment of the new counterfeit statute, 15 U.S.C. § 1116(d)(2), this Court issued ex parte seizure orders under its traditional equitable powers."); *Joel*, 499 F. Supp. at 792 ("A court of equity is free to fashion whatever remedies will adequately protect the rights of the parties before it."). Indeed, the Senate Judiciary Committee's report on the TCA noted that "many federal district courts now authorize ex parte seizures in certain trademark infringement cases brought under the Lanham Act." S. Rep. 98-526, at 7; *see also id.* (citing with approval *In re Vuitton*). Nevertheless, Congress deemed it necessary to codify the procedure for *ex parte* seizure orders in the TCA, thereby balancing the constitutional requirements of due process with "the extraordinary bad faith exhibited by many commercial counterfeiters." *Id.* at 8. Since the passage of the TCA, it has been suggested that upwards of several thousand *ex parte* seizure orders have issued. *See* Zalon, *supra*, at 191. At the same time, some district judges

have issued blistering rebukes to the contemporary practice. *See id.* at 191–94 (collecting cases); *see also, e.g.*, *Plant v. Doe*, 19 F. Supp. 2d 1316 (S.D. Fla. 1998); *Bravado Int'l Grp. Merch. Servs., Inc. v. Smith*, No. 8:12-CV-613-T-23EAJ, 2012 WL 1155858 (M.D. Fla. Mar. 27, 2012).

### B.    *Ex Parte* Practice Under the TCA

Given the nature of the relief they provide, the TCA's *ex parte* seizure orders have generated numerous concerns from the district judges tasked with issuing them. In my view, those concerns were fairly catalogued by Judge Beaton in *Merch Traffic, LLC v. Does*, 620 F. Supp. 3d 644 (W.D. Ky. 2022): (1) emergency proceedings, (2) *ex parte* orders, (3) seizure without a contested pre-deprivation hearing, (4) John Doe defendants, and (5) nationwide injunctions. *Id.* at 648. My own concerns about personal jurisdiction echo in Judge Beaton's analysis of the nationwide preliminary injunction sought by representatives of rock legends Metallica in *Merch Traffic*; there, Judge Beaton declined to issue a nationwide injunction, reasoning that "[b]ootleggers actually served at the Louisville concerts may have notice and certainly fall within this Court's geographic jurisdiction . . . [b]ut bootleggers elsewhere would not—at least not on this limited showing." *Id.* at 653.

With all respect to Judge Beaton and every other district judge tasked with this thorny jurisdictional question, I conclude from a review of the relevant

caselaw that no court appears to have issued an order comprehensively addressing this question. Of course, the development of the law on this point has been hampered by the near-universal experience that "no defendants ever show up to contest § 1116(d) seizures." *Id.* at 651; *see also* Baker & Fesak, *supra*, at 765 ("In current practice, a trademark owner almost never meets opposition in court.") (collecting cases). Such is the case here as well: 30 defendants have been served in the 2023 case,[33] and six defendants have been served in the 2024 case.[34] Not one has made an appearance. And our justice system is based—indeed, *depends*—on the adversarial process to achieve fair outcomes.

While *ex parte* seizure orders are a unique creation of the TCA, they are often subsumed into a more traditional TRO pursuant to Fed. R. Civ. P. 65(b). *See* 4 *McCarthy on Trademarks and Unfair Competition* § 30:38 (5th ed.). The common explanation for this practice is that 15 U.S.C. § 1116(d), which authorizes *ex parte* seizure orders under defined circumstances, grounds the court's authority to issue such orders in § 1116(a), which in turn grants courts the power to enjoin certain violations of the Lanham Act. *See* Baker, *supra*, at 381. It follows, then, that an *ex parte* seizure order must accompany a TRO, which is the only form of injunctive relief that can be granted *ex parte*. *Id.* (citing Fed. R. Civ. P. 65(a)(1)).

---

[33]    Decl. of John T. Rose, Case No. 1:23-cv-03516, ECF 18-1, ¶ 5.

[34]    Decls. of John T. Rose, Case No. 1:24-cv-03509, ECFs 15, 21, 34, 39.

Section 1116(a) also provides that injunctions granted under the TCA "may be served on the parties against whom such injunction is granted anywhere in the United States where they may be found." I have interpreted this provision as allowing nationwide service of process. *See, e.g.*, Oct. 2, 2024 Prelim. Inj., TRO, and Seizure Order, Case No. 1:24-cv-03509, ECF 37, at 3; *see also Merch Traffic*, 620 F. Supp. 3d at 652 (citing 15 U.S.C. § 1116(a)) ("The Lanham Act provides for nationwide *service*, not jurisdiction.") (emphasis in original).[35] The Eleventh Circuit has interpreted almost identical language in the federal securities laws to permit nationwide service of process. *See SEC v. Marin*, 982 F.3d 1341, 1349 (11th Cir. 2020) (interpreting 15 U.S.C. § 78u(c)) (holding that the SEC "may serve process on the target of the subpoena 'in the judicial district whereof such person is an inhabitant or wherever he may be found'"); *see also SEC v. Carrillo*, 115 F.3d 1540, 1544 & n.4 (11th Cir. 1997) (interpreting 15 U.S.C. §§ 77v(a), 78aa) (holding that the Securities Act of 1933 and the Securities Exchange Act of 1934 allow worldwide service of process, based upon statutory language that service is authorized "on a defendant in any district 'of which the defendant is an inhabitant or wherever the defendant may be found.'"). The question, then, is whether the

---

[35] For the reasons set out in Section II.C., *infra*, I respectfully disagree with Judge Beaton's conclusion concerning jurisdiction.

exercise of personal jurisdiction over the served defendants in this district is consistent with due process.

## C.    Personal Jurisdiction Under the TCA

Whether this Court may exercise personal jurisdiction over defendants located outside of this district is a two-part question: first, whether the applicable statute confers jurisdiction over the defendant; and second, if so, whether the exercise of jurisdiction comports with due process. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997). As in *BCCI Holdings*, the Court "need not pause long over the first question," because "[w]hen a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction." *Id.* Because the TCA provides for nationwide service of process, 15 U.S.C. § 1116(a), it provides the statutory basis for the exercise of personal jurisdiction in these cases. However, the second, constitutional step "is considerably more involved." 119 F.3d at 942.

### 1.    The Fifth Amendment governs the personal jurisdiction analysis in these cases.

When "a federal statute provides the basis for jurisdiction, the constitutional limits of due process derive from the Fifth, rather than the Fourteenth, Amendment." *Id.* In *BCCI Holdings*, the Eleventh Circuit held that "constitutional notions of 'fairness' and 'reasonableness'"—familiar from the Supreme Court's personal jurisdiction jurisprudence in the Fourteenth Amendment context, *e.g.*,

15

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)—are applicable to federal statutory jurisdiction, as limited by the Fifth Amendment. 119 F.3d at 945. At the same time, "the fact that the United States is the sovereign asserting its power undoubtedly must affect the way the constitutional balance is struck." *Id.*

Noting that other circuits had concluded that the Fifth Amendment "protects individual litigants against the burdens of litigation in an unduly inconvenient forum," the Eleventh Circuit directed courts to "balance the burdens imposed on the individual defendant against the federal interest involved in the litigation" by "determin[ing] if the infringement on individual liberty has been justified sufficiently by reference to important governmental interests." *Id.* at 945–46 (citing *In re Chase & Sanborn Corp.*, 835 F.2d 1341, 1345 (11th Cir. 1988), *rev'd on other grounds sub nom. Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *Handley v. Indiana & Michigan Elec. Co.*, 732 F.2d 1265, 1272 (6th Cir. 1984); *Horne v. Adolph Coors Co.*, 684 F.2d 255, 259 (3d Cir. 1982); *Lone Star Package Car Co. v. Baltimore & O.R. Co.*, 212 F.2d 147, 155 (5th Cir. 1954)). However, the balancing test is only required where "a defendant has established that his liberty interests actually have been infringed," *id.* at 946, by "present[ing] a compelling case that . . . would render jurisdiction unreasonable," *id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

As noted earlier, no defendant has appeared in these cases, a common feature of TCA litigation.[36] The record indicates that most of the served defendants were neither residents of, nor served with process in, this district.[37] Plaintiffs moved for default judgment in the 2023 case, and I will order them to do so in the 2024 case as well.[38] "In considering a motion for entry of default judgment, a court must investigate the legal sufficiency of the allegations of the plaintiff's complaint," and though "the factual allegations of plaintiff's complaint are deemed admitted," the conclusions of law are not. *Bruce v. Wal-Mart Stores, Inc.*, 699 F. Supp. 905, 906 (N.D. Ga. 1988) (citing *Nishimatsu Construction Company, Ltd. v. Houston National Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). Whether personal jurisdiction is present is one such question of law, and an "*in personam* judgment entered without personal jurisdiction over a defendant is void as to that defendant." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009) (cleaned up). Therefore, I will take up the Fifth Amendment analysis.

---

[36] On June 5, 2025, I entered an amended order for service by publication of several defendants in the 2024 case. Case No. 1:24-cv-03509, ECF 68.

[37] *See* Notes 33 & 34, *supra*.

[38] Case No. 1:23-cv-03516, ECF 20; *see also* Section II.D.2., *infra*.

### 2. The served defendants purposefully established minimum contacts with the United States.

This Court's exercise of personal jurisdiction over the served defendants satisfies Fifth Amendment due process when "(1) the nonresident defendant has purposefully established minimum contacts with the forum and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice." *Marin*, 982 F.3d at 1349 (quoting *Carrillo*, 115 F.3d at 1542). If that sounds familiar, it is because the Fifth Amendment, like the Fourteenth (under which the likes of *International Shoe*, *World-Wide Volkswagen*, and *Burger King* were decided), is "designed to protect individuals by providing them with fair notice that their activities will render them liable to suit in a particular forum." *Marin*, 982 F.3d at 1349 (quoting *BCCI Holdings*, 119 F.3d at 945). The requirement of fair warning is satisfied where the defendant "has purposefully directed his activities at residents of the forum." *Id.* (quoting originally *Burger King*, 471 U.S. at 472). In making this determination, the Court applies the familiar "minimum contacts" analysis. *Id.* Critically here, where personal jurisdiction is based on a federal statute, "the relevant inquiry is whether the respondent has had sufficient minimum contacts with the United States" rather than the State where the Court sits. *Carrillo*, 115 F.3d at 1543 (collecting cases).

The rationale for this rule is multi-layered. The bedrock principle is that "service of process constitutes the vehicle by which the court obtains jurisdiction."

*Id.* (quoting *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992)). Where a federal statute permits nationwide service of process, it "broadens the authorized scope of personal jurisdiction" past "the boundaries of the forum state," *id.*, a limit imposed by Fed. R. Civ. P. 4(k), *see United Elec.*, 960 F.2d at 1085–86 (applying then-Fed. R. Civ. P. 4(f)). Additionally, from a constitutional perspective, in federal question cases "the federalism concerns which hover over the jurisdictional equation in a diversity case are absent." *Carrillo*, 115 F.3d at 1543 (quoting *United Elec.*, 960 F.2d at 1085). Thus, a federal district court exercising federal question subject matter jurisdiction may obtain personal jurisdiction over a nonresident defendant served pursuant to a nationwide service of process provision, consistent with the due process requirements of the Fifth Amendment, so long as the defendant has minimum contacts with the United States. Defendants here have satisfied the minimum contacts test in two ways: (i) they purposefully availed themselves of the United States by selling allegedly counterfeit SSB merchandise here; and (ii) they have chosen to reside in the United States.

### i.    The served defendants purposefully availed themselves of the United States by selling allegedly counterfeit SSB merchandise here.

Defendants in the 2023 case were served based on alleged bootlegging at venues in Alabama, Georgia,[39] Florida, North Carolina, Massachusetts, Washington, D.C., New York, Indiana, Illinois, and Texas.[40] Defendants in the 2024 case were served based on similar activity at venues in Texas, Washington, New Mexico, and Massachusetts.[41] The alleged bootlegging activity is the crux of Plaintiffs' complaints and the basis for the TROs, and so it is clear that the served defendants "ha[ve] purposefully directed activities at the forum," *i.e.*, the United States, such that defendants have "fair notice that their activities will render them liable to suit in" a United States district court. *Marin*, 982 F.3d at 1349 (quoting *BCCI Holdings*, 119 F.3d at 945).

### ii.    The served defendants purposefully availed themselves of the United States by choosing to live here.

The Eleventh Circuit has held that "a United States resident . . . [who] necessarily has 'directed . . . activities at the United States' 'through [her] choice of residence . . . ,' satisfies the purposeful availment component of Fifth Amendment

---

[39]    Defendants served with process in this district do not implicate the same due process concerns but are listed here for the sake of completeness.

[40]    Decl. of John T. Rose, Case No. 1:23-cv-03516, ECF 18-1, ¶ 5.

[41]    Aug. 23, Sept. 4, Sept. 18, and Oct. 2, 2024 TRO Hr'gs, Case No. 1:24-cv-03509.

due process analysis." *Id.* at 1350 (quoting *BCCI Holdings*, 119 F.3d at 945 n.16). The Fifth Circuit has held similarly, albeit on more expansive grounds, and over the dissent of Judge Garza. *See Busch v. Buchman, Buchman & O'Brien, L. Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994) ("Given that the relevant sovereign is the United States, it does not offend traditional notions of fair play and substantial justice to exercise personal jurisdiction over a defendant residing within the United States."); *but see id.* at 1259 (Garza, J., dissenting) ("Because the personal jurisdiction requirement is a function of the individual liberty interest, the proper focus for a personal jurisdiction test should be on protecting an individual's liberty interest in avoiding the burdens of litigating in a distant or inconvenient forum. Requiring that the individual defendant in a national service of process case only reside somewhere in the United States does not protect this interest.").[42] So has the Seventh Circuit in *Fitzsimmons v. Barton*, 589 F.2d 330, 333 (7th Cir. 1979) ("Here the sovereign is the United States, and there can be no question but that the defendant, a resident citizen of the United States, has sufficient contacts with the United States to support the fairness of the exercise of jurisdiction over him by a United States

---

[42] The Third Circuit has favorably cited *Busch* in an unpublished opinion. *See Sinclair v. Att'y Gen. of U.S.*, 198 F. App'x 218, 222 (3d Cir. 2006). Meanwhile, the Tenth Circuit has split the difference, favorably citing both Judge Garza's dissent in *Busch* and the Eleventh Circuit's opinion in *BCCI Holdings*. *See Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1211, 1212 (10th Cir. 2000).

court."). That decision was reaffirmed in 2000. *Bd. of Trs., Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1036 (7th Cir. 2000). This sounds a lot like general personal jurisdiction for United States residents in appropriate federal question cases.

I will note that there is some doctrinal tension in this formulation of the Fifth Amendment minimum contacts analysis for United States residents. The concept of relatedness is the critical distinction between assertions of general and specific personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn.8, 9 (1984). The minimum contacts analysis is a species of the latter because the Fourteenth Amendment "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations" by "requiring that individuals have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." *Burger King*, 471 U.S. at 471–72 (cleaned up). By contrast, "most courts treat as self-evident the state's right to subject domiciliaries to the jurisdiction of its courts." Lea Brilmayer, Jennifer Haverkamp & Buck Logan, *A General Look at General Jurisdiction*, 66 Tex. L. Rev. 721, 729 (1988) (citing, *inter alia*, *Skiriotes v. Florida*, 313 U.S. 69, 77 (1941)). The United States is certainly not a "foreign sovereign" to any of its residents, yet it is not self-evident to the circuit courts that the United States has an untrammeled right to subject its

residents to the jurisdiction of every single one of its courts, wherever located. *Compare Busch*, 11 F.3d at 1258 ("[I]t does not offend traditional notions of fair play and substantial justice to exercise personal jurisdiction over a defendant residing within the United States."), *with Peay*, 205 F.3d at 1211 (quoting *Busch*, 11 F.3d at 1259 (Garza, J., dissenting)) ("Requiring that the individual defendant in a national service of process case only reside somewhere in the United States does not protect" the individual's liberty interest), *and BCCI Holdings*, 119 F.3d at 945 n.16, 947 (holding that the "'purposeful availment' prong of due process will have no application in the case of domestic defendants," but "courts must ensure that requiring a defendant to litigate in plaintiff's chosen forum is not unconstitutionally burdensome.").

The reason for this tension can probably be traced to the Supreme Court's evolving interpretation of personal jurisdiction as "a matter of individual liberty," rather than "a matter of sovereignty." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinée*, 456 U.S. 694, 702 (1982); *but see Stafford v. Briggs*, 444 U.S. 527, 554 (1980) (Stewart & Brennan, JJ., dissenting) (citing *Shaffer v. Heitner*, 433 U.S. 186 (1977); *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)) ("[D]ue process requires only certain minimum contacts between the defendant and the sovereign that has created the court . . . . The cases before us involve suits against residents of the United States in the courts of the United States. No due process problem exists.").

23

The Eleventh Circuit recognized as much in *BCCI Holdings*, concluding that the Supreme Court's decision in *Bauxites* had abrogated the sovereignty rationale underlying the former Fifth Circuit's holding in *Federal Trade Commission v. Jim Walter Corp.*, 651 F.2d 251 (5th Cir. 1981), that a "resident United States corporation . . . necessarily ha[d] sufficient contacts with the United States to satisfy the requirements of due process." *BCCI Holdings*, 119 F.3d at 943.

In response, the Eleventh Circuit carved a middle path, holding that (1) "[b]ecause the relevant forum under the Fifth Amendment is the United States, this 'purposeful availment' prong of due process will have no application in the case of domestic defendants, who, through their choice of residence or incorporation, have purposefully directed their activities at the United States"; but (2) "even when a defendant resides within the United States, courts must ensure that requiring a defendant to litigate in plaintiff's chosen forum is not unconstitutionally burdensome." *BCCI Holdings*, 119 F.3d at 945 n.16, 947. Subsequently in *Marin*, the Eleventh Circuit noted that the defendant was a United States citizen and resident but also cited her "purposely directed activities at the United States, including activities relevant to the SEC's subpoenas" in concluding that the purposeful availment requirement was satisfied. 982 F.3d at 1350.

These SSB cases are similar to *Marin* in that regard, as the served defendants are United States residents who have purposefully directed activities at venues

across the United States.[43] Accordingly, the purposeful availment prong of due process is easily satisfied here.

### 3. This district is not an unconstitutionally burdensome forum.

Even where the purposeful availment prong is satisfied, I must also consider whether "minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction." *BCCI Holdings*, 119 F.3d at 947 (quoting *Burger King*, 471 U.S. at 477–78). To do this, the Eleventh Circuit has directed courts to "ensure that requiring a defendant to litigate in plaintiff's chosen forum is not unconstitutionally burdensome." *Id.* Notably, "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Id.*

#### i. Constitutionally Significant Inconvenience Under the Fifth Amendment

What exactly would qualify as a constitutionally significant inconvenience under the Fifth Amendment remains unclear.[44] However, the caselaw has suggested at least two non-mutually exclusive analytical methods, plus a handful of additional considerations.

---

[43] *See* Section II.C.2.i., *supra.*

[44] In the three reported opinions on this point, the Eleventh Circuit has rejected attempts at such an argument. *See BCCI Holdings*, 119 F.3d at 948; *Marin*, 982 F.3d at 1350–51; *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1158 (11th Cir. 2019).

### *a.* **The Geographic Analysis**

The first method involves pulling out a map. In *BCCI Holdings*, the Eleventh Circuit held that the moving defendants—"large corporations providing banking services to customers in major metropolitan areas along the eastern seaboard"—would not suffer any constitutionally significant inconvenience from the assertion of personal jurisdiction in the Southern District of Florida, despite a lack of significant contacts with Florida. *Id.* at 948. In *Marin*, the Eleventh Circuit rejected a Fifth Amendment challenge to the SEC requiring a New York resident to contest or comply with a subpoena in Miami, noting that "Miami is a short direct flight from New York City's airports," a distance of approximately 1,300 miles, and testimony was likely to take only one day. 982 F.3d at 1351. If that is the standard in this circuit, then drawing a 1,300-mile radius around Atlanta brings within this Court's constitutional jurisdiction the entirety of Minnesota, Iowa, Nebraska, Kansas, Oklahoma, and Texas, as well as every state east, plus parts of the Dakotas, Wyoming, Colorado, and New Mexico.[45] However, the exact parameters of this method are not well developed.

---

[45] Readers are encouraged to check my geographic calculations at https://www.freemaptools.com/radius-around-point.htm [https://perma.cc/SLK8-J2X2].

### b.    The Fullerton Analysis

The Eleventh Circuit has hinted at what might cross the constitutional line, suggesting a second method that in many ways builds on the first. In *BCCI Holdings*, the court cautioned that "[t]here are circumstances, although rare, in which a defendant may have sufficient contacts with the United States as a whole but still will be unduly burdened by the assertion of jurisdiction in a faraway and inconvenient forum." 119 F.3d at 947. Without providing examples, the court cited to Maryellen Fullerton's *Constitutional Limits on Nationwide Personal Jurisdiction in the Federal Courts*, 79 Nw. U.L. Rev. 1 (1984), in particular a discussion of "circumstances in which [the] burdens of defending [a] federal question case would be constitutionally significant." 119 F.3d at 947 n.24.

Fullerton posits two hypothetical scenarios that would "present a compelling case that would render jurisdiction unreasonable," *id.* at 946, the preliminary showing required to even consider whether "the federal interest in litigating the dispute in the chosen forum outweighs the burden imposed on the defendant," *id.* at 948. First, the president of a bankrupt Alaska corporation files an adversary claim in a pending bankruptcy proceeding in the Alaska federal bankruptcy court, naming Florida and Guam corporations (the winners of a government contract bidding process issued from New York) as defendants. Fullerton, *supra*, at 77–78. Nationwide service of process is available pursuant to

the Bankruptcy Rules, and venue is proper. *Id.* at 78. Fullerton suggests that due process may be violated by the exercise of personal jurisdiction over the Florida and Guam defendants because (1) litigation in Alaska would cause them substantial inconvenience; (2) the defendants could not have reasonably anticipated suit in Alaska or the surrounding region; and (3) the federal interests in maintaining the litigation in Alaska are outweighed by the "inconvenience and surprise" to the defendants. *Id.* at 78–79. In the second scenario, Fullerton imagines a different outcome in a Federal Interpleader Act case between an Alaskan resident (the beneficiary of the life insurance policy of her deceased sister, a New Yorker), the New York insurance company, and the heiress's creditors from Florida and Guam, based upon the stronger federal interests underlying the Interpleader Act. *Id.* at 79–80. Fullerton's analysis suggests that significant geographical distance is a necessary but not a sufficient condition for demonstrating a constitutionally significant inconvenience. Only after a defendant shows that his journey is long should the court embark on an all-too-familiar weighing of the interests.

### c.    Other Considerations

Clearly, geographic distance remains the primary—and perhaps only— driver of the burden analysis. But the Eleventh Circuit recognized as early as 1988 that "[m]odern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum." *In re Chase & Sanborn Corp.*, 835

F.2d at 1346. This pronouncement was made approximately twenty years before

remote communication platforms like Zoom (the platform on which the hearings

in these cases have been hosted[46]) became prevalent.[47] Subsequently in *Carrillo*, the

Eleventh Circuit rejected a Costa Rican corporation's argument that it would be

burdened by litigating in the United States (specifically, the Southern District of

Florida), relying in part on the availability of "modern methods of transportation

and communication." 115 F.3d at 1547.[48]

      In her article, Fullerton also posits that the burden considerations may be

different for a wealthy defendant or a corporation "with far-flung enterprises,"

Fullerton, *supra*, at 80, a proposition that the Supreme Court at least hinted at in

*Burger King*, 471 U.S. at 484 (holding that personal jurisdiction in Florida over a

Michigan franchisee based on a long-term contractual arrangement with a Florida

---

[46]   *See, e.g.*, Case No. 1:24-cv-03509, ECFs 4, 11, 13, 20, 31, 36.

[47]   *See Biography of Eric S. Yuan*, https://www.zoom.com/en/about/team/ [https://perma.cc/BAW8-LMGF].

[48]   *Carrillo* was decided approximately two months before *BCCI Holdings*, which most likely explains why the court in *Carrillo* weighed the federal interest in litigating the case in the forum against the burden on the defendant, 115 F.3d at 1547, without making the preliminary determination that the defendant "met [its] burden of establishing constitutionally significant inconvenience," as suggested by *BCCI Holdings*, 119 F.3d at 946. And, while it goes unmentioned in *Carrillo*, Puerto Carrillo, Costa Rica (taken from one of the defendant's names) is approximately 1,150 miles from the Southern District of Florida's district court in Miami. *See* Section II.C.3.i.a. & Note 45, *supra*.

corporation was constitutional under the Fourteenth Amendment and noting the district court's factual finding that the franchisees were "experienced and sophisticated businessmen"), 485 (rejecting the Eleventh Circuit's concern that exercising personal jurisdiction in *Burger King* would lead to "the exercise of jurisdiction over out-of-state consumers to collect payments due on modest personal purchases and would sow the seeds of default judgments against franchisees owing smaller debts.") (cleaned up). In a recent case in this district involving reality TV actor Michael (Todd) Chrisley, then-Chief Judge Batten rejected Chrisley's personal jurisdiction challenge, reasoning in part that "[h]e is a wealthy man," and thus "[t]he Court has no trouble concluding that the burden on Chrisley of litigating in this district would be slight." *Doherty-Heinze v. Chrisley*, No. 3:21-CV-105-TCB, 2022 WL 18938046, at *9 (N.D. Ga. July 18, 2022).

### d. A Unified Analytical Method

Taken together, it seems that "a compelling case that . . . would render jurisdiction unreasonable" is a very high bar. *BCCI Holdings*, 119 F.3d at 946. It probably requires a defendant to show that he will be required to travel a considerable distance—perhaps at least 1,300 miles, *see Marin*, 982 F.3d at 1350–51, or perhaps as far as the distance between Florida and Alaska, *see* Fullerton, *supra*, at 78–79—and that his stay in this district will last more than one day, *see Marin*, 982 F.3d at 1351. It probably requires a defendant to show that there is not some

overlap between his regular activities and the broader geographic area of the district court. *See BCCI Holdings*, 119 F.3d at 948; *cf.* Fullerton, *supra*, at 80. It probably requires a defendant to show that "modern methods of transportation and communication" do not "ameliorate[ ]" the burden of litigating in this district. *See Carrillo*, 115 F.3d at 1547. And it might require individual defendants to show that they are not so wealthy that the burden of litigating in this district is slight. *See Chrisley*, 2022 WL 18938046, at *9.

> ### ii. The record does not present a compelling case that would render jurisdiction over the served defendants unreasonable.

At last, we turn to the defendants in these cases. A review of the record indicates that all the served defendants are United States residents, based on the addresses listed on their identification, and therefore the purposeful availment test is satisfied. *See Marin*, 982 F.3d at 1350. With none of the defendants having appeared, they have failed to meet their "burden of establishing constitutionally significant inconvenience." *BCCI Holdings*, 119 F.3d at 946. But even if I briefly take up their cause for the sake of argument, I can comfortably conclude that the liberty interests of the served defendants have not been infringed.

All 30 defendants served in the 2023 case live within the 1,300-mile radius suggested in *Marin*.[49] Indeed, 14 of the defendants live in the New York City-area, just like the defendant in *Marin*.[50] In total, the defendants in the 2023 case come from New York, Pennsylvania, North Carolina, Georgia, South Carolina, Colorado, Connecticut, Florida, Wisconsin, and New Jersey.[51]

The six defendants served in the 2024 case would, at least in theory, have to travel farther. Four of the defendants live in California, and one lives in Nevada; of less concern is the defendant who lives in New York.[52] However, concerns as to the burden on the served defendants of traveling here for litigation are diminished by the fact that they appear to have already traveled long distances to sell their allegedly counterfeit merchandise. Defendants Young and Roy, both Californians were served at Plaintiffs' concerts in Texas.[53] In fact, Defendant Roy was subsequently served with another TRO from the 2024 case at Plaintiffs' concert in

---

[49] Decl. of John T. Rose, Case No. 1:23-cv-03516, ECF 18-1, ¶ 5. Note that Denver, Colorado, is within the radius, though other parts of Colorado are not. *See* Note 45, *supra*.

[50] Decl. of John T. Rose, Case No. 1:23-cv-03516, ECF 18-1, ¶ 5.

[51] *Id.*

[52] Decls. of John T. Rose, Case No. 1:24-cv-03509, ECFs 15, 21, 34, 39. The New York defendant (McKay) was served at Plaintiffs' concert in Massachusetts. *Id.*, ECF 39, ¶ 11.

[53] Aug. 23, 2024 TRO Hr'g; *see also* Decl. of John T. Rose, Case No. 1:24-cv-03509, ECF 15, ¶ 5.

Albuquerque, New Mexico.[54] Defendants McKinizie (California) and Butler (Nevada) were also served at Plaintiffs' Albuquerque concert.[55] Defendant Nelson, another Californian, was served at Plaintiffs' concert in Seattle, Washington.[56] It seems fair to conclude for present purposes that the burden placed on the served defendants to defend the 2024 case are no greater than the burdens of their chosen profession.

There is also considerable overlap between the defendants' alleged bootlegging activities and the greater geographic region of this Court. In the 2023 case, the defendants were served at SSB concerts in Alabama; Georgia; Florida; North Carolina; Massachusetts; Washington, D.C.; New York; Indiana; Illinois; and Texas.[57] In the 2024 case, the defendants were served at SSB concerts in Texas, New Mexico, Washington, and Massachusetts.[58] Of those locations, four are in this circuit (Birmingham, Alabama; Atlanta, Georgia; and Jacksonville and Sunrise, Florida), and a fifth is located in neighboring North Carolina (Charlotte).[59]

---

[54]  Sept. 18, 2024 TRO Hr'g; *see also* Decl. of John T. Rose, Case No. 1:24-cv-03509, ECF 34, ¶ 7.

[55]  *Id.*

[56]  Sept. 4, 2024 TRO Hr'g; *see also* Decl. of John T. Rose, Case No. 1:24-cv-03509, ECF 21, ¶ 5.

[57]  Decl. of John T. Rose, Case No. 1:23-cv-03516, ECF 18-1, ¶ 5.

[58]  See Notes 52–56, *supra*.

[59]  Decl. of John T. Rose, Case No. 1:23-cv-03516, ECF 18-1, ¶ 5.

In each of these cases, I have held all hearings via Zoom, and the TROs entered in those cases provide the call-in information, precisely because this "[m]odern means of communication" would lessen the burden for any served defendant to defend against Plaintiffs' lawsuits. *Marin*, 982 F.3d at 1351. None of the defendants have taken advantage of this opportunity, nor have they used modern means of communication to retain a member of the bar of this Court to enter an appearance on their behalf.

Lastly, it seems unlikely that the served defendants are wealthy enough to fund otherwise burdensome litigation in this district. My own experience in these cases has been consistent with commentators' observation that "the majority of counterfeiters are street vendors who peddle their goods at flea markets, city kiosks, and live entertainment events and that operate on the fringe of society. These itinerant vendors are nomadic by nature and are highly unlikely to challenge a seizure order in court." Baker & Fesak, *supra*, at 765–66 (cleaned up). Nonetheless, the ultimate question is whether the defendants' burden in litigating here is so inconvenient as to be constitutionally significant. Having considered all of these factors—and without the benefit of an individualized presentation by any defendant—I conclude that it is not, and therefore the exercise of personal jurisdiction in this district over the served defendants is consistent with the Fifth Amendment.

### 4. Weighing the Federal Interests Against the Burdens Imposed on the Served Defendants

Having made it this far, it would be a shame to forego the final piece of the analysis: whether "the federal interest in litigating the dispute in the chosen forum outweighs the burden imposed on the defendant." *BCCI Holdings*, 119 F.3d at 948. To conduct the weighing analysis, courts in the Eleventh Circuit are directed to examine at least four factors: (1) the federal policies advanced by the statute; (2) the relationship between nationwide service of process and the advancement of these policies; (3) the connection between the exercise of jurisdiction in the chosen forum and the plaintiff's vindication of his federal right; and (4) concerns of judicial efficiency and economy. *Id.*

### i. The Federal Policies Advanced by the TCA

First, I will consider the federal policies advanced by the TCA. The Senate Judiciary Committee's report on the TCA is unequivocal: the TCA was "designed to provide both federal prosecutors and trademark owners with essential tools for combatting th[e] insidious and rapidly growing" practice of counterfeiting. S. Rep. 98-526, at 1. Noting that "it is unlikely that busy federal prosecutors will be able to prosecute more than a fraction of those who traffic in known fakes," the TCA "encourage[s] private enforcement." *Id.* at 2. The *ex parte* seizure orders permitted by the TCA were established to "ensure that plaintiffs can effectively enforce their rights under" the statute. *Id.*

Indeed, the committee believed that the *ex parte* seizure orders were necessary given the "widespread use of bad faith tactics" by counterfeiters which "prevent the courts from effectively exercising their jurisdiction." *Id.* at 7. Moreover, the TCA was passed to standardize the practice for obtaining *ex parte* seizure orders—which had to that point been a novel and controversial remedy—including by "provid[ing] stringent safeguards against abuse." *Id.* The committee's favorable citation to *In re Vuitton* speaks volumes. *Id. In re Vuitton* was decided before the passage of the TCA, and in that decision the Second Circuit issued a writ of mandamus directing the district judge to issue an *ex parte* TRO (the pre-TCA analogue to the *ex parte* seizure order), over the district judge's previous admonition to the *Vuitton* plaintiffs that further requests for an *ex parte* TRO "would be considered by him to be 'vexatious.'" 606 F.2d at 3 & n.5.

### ii. The Relationship Between Nationwide Service of Process and the Advancement of These Policies

Second, I will consider the relationship between nationwide service of process and the advancement of the federal policies described in the previous subsection. On this point, the Eleventh Circuit has put its thumb on the scale, noting in *BCCI Holdings* that, where "Congress has provided for nationwide service of process, courts should presume that nationwide personal jurisdiction is necessary to further congressional objectives." 119 F.3d at 948. The TCA provides for nationwide service, and so I will presume that nationwide personal jurisdiction

is necessary to further the statute's objectives. But this conclusion does not necessarily require this presumption.

The Senate report emphasized the difficulty that plaintiffs and courts had experienced in enforcing the Lanham Act before the passage of the TCA:

> [T]hose who traffic in counterfeits have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon. Counterfeiters often operate in networks, and if any member of the network learns that his fraud has been discovered, he will immediately transfer the counterfeit goods to another member of the network for safekeeping. Alternatively a counterfeiter may destroy the goods or secrete them elsewhere . . . .
>
> A common result is that after giving a counterfeiter notice of an upcoming hearing, the victimized plaintiff will be met in court with a version of the following refrain: 'I bought only a few pieces from a man I never saw before and whom I have never seen again. All my business was in cash. I do not know how to locate the man from whom I bought and I cannot remember the identity of the persons to whom I sold.' *In re Vuitton et Fils*, 606 F.2d 1, 2 (2d Cir. 1979).

S. Rep. 98-526, at 6–7. While not thoroughly discussed in its report, the committee also favorably cited J. Joseph Bainton's *Seizure Orders: An Innovative Judicial Response to the Realities of Trademark Counterfeiting*, 73 Trademark Rep. 459 (1983), *reprinted in Hearings on S. 875 before the Subcommittee on Patents, Copyrights, and Trademarks of the Senate Committee on the Judiciary*, 98th Cong., 1st Sess. 120–36 (1983), which compiled cases in which district courts had authorized *ex parte*

seizures under the pre-TCA Lanham Act. Bainton, 73 Trademark Rep. at 463 n.11. Among the cases listed by Bainton are *Joel v. Various John Does*, 499 F. Supp. 791 (E.D. Wis. 1980), referenced in Section II.A., *supra*, brought by Billy Joel, as well as *Moon Rocords [sic] v. Various John Does*, 217 U.S.P.Q. 46, No. 81 C 907, 1981 WL 47050 (N.D. Ill. Feb. 26, 1981), involving the rock band Rush.[60] Thus, it is reasonable to conclude that Congress was fully aware that touring musicians were frequent targets of roving counterfeit operations. *See Joel*, 499 F. Supp. at 792–93 ("According to the plaintiffs, there are a number of persons who show up at Billy Joel's concerts with merchandise . . . . Billy Joel, needless to say, has not given these entrepreneurs permission to use his name or his likeness."); *Moon Rocords*, 1981 WL 47050, at *1 ("The plaintiffs ask for a temporary restraining order and an order requiring the United States Marshal to seize the infringing merchandise at the RUSH concerts.").

It would run directly counter to the express purposes of the TCA— "encourag[ing] private enforcement" and assisting courts to "effectively exercise their jurisdiction," S. Rep. 98-526, at 2, 7—to circumscribe the personal jurisdiction

---

[60] While the old case files are less readily available, a review of the party names indicates that *ex parte* orders were also granted to, among others, country legend Kenny Rogers and rock band Styx. *See* Bainton, *supra*, at 463 n.11 (citing, *e.g.*, *Kenny Rogers Prods., Inc. v. Various John Does*, No. CV-80-2564 (E.D.N.Y. Sept. 25, 1980); *Rock Tours, Ltd. v. Various John Does*, No. 80-742-MA (D. Mass. Apr. 17, 1980)).

afforded by its nationwide service of process provision. The "bad faith tactics" of counterfeiters, such as anonymous cash transactions, destruction or secretion of the counterfeit goods, and "'dumping' of counterfeit goods or transfer of counterfeit goods to unknown third parties," *id.* at 7 (quoting *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F. Supp. 248, 250 (S.D. Fla. 1982)),[61] can quite obviously cross district or even regional lines, particularly where the counterfeiters are operating in "networks," *id.*

Nor would it encourage private enforcement if plaintiffs were obligated to seek an *ex parte* seizure order in every district in which the allegedly counterfeit goods were present. By my estimation, Plaintiffs' 2024 tour had stops in 35 judicial districts.[62] While I wholeheartedly believe that I subjected Plaintiffs to the rigorous review required by the TCA, and that Plaintiffs met their burden, some other judges around the country have been, to put it charitably, less amenable to these sorts of proceedings. *See, e.g.*, *Plant v. Doe*, 19 F. Supp. 2d 1316 (S.D. Fla. 1998); *Bravado Int'l Grp. Merch. Servs., Inc. v. Smith*, No. 8:12-CV-613-T-23EAJ, 2012 WL

---

[61] The court in *Fimab* expressly noted that then-Judge Horace Ward of this district had previously ordered the seizure of counterfeit Cartier merchandise from John Doe defendants, who were later identified as residents of a different judicial district, at which point Judge Ward ordered seizure in that district. 548 F. Supp. at 250 (citing *Cartier, Inc. v. Bags 'N' Things, Inc.*, No. C82-34A (N.D. Ga. 1982)).

[62] Compl., Case No. 1:24-cv-03509, ECF 1, ¶ 17.

1155858 (M.D. Fla. Mar. 27, 2012). Subjecting Plaintiffs to 35 proceedings in 35 districts—effectively requiring Plaintiffs' counsel to tour with the band—does not encourage private enforcement of Plaintiffs' rights under the Lanham Act. Therefore, I conclude that nationwide personal jurisdiction is necessary to further the TCA's objectives.

> ### iii.    The Connection Between the Exercise of Jurisdiction in this District and Plaintiffs' Vindication of Their Federal Rights

Third, I will consider the connection between the exercise of jurisdiction in this forum and Plaintiffs' vindication of their federal rights.[63] Atlanta was the second stop on the 2023 tour, the third stop on the 2024 tour, and the fifteenth stop on the 2022 tour.[64] Plaintiffs are residents of Louisiana, and their merchandising company is a Florida corporation headquartered in California.[65] Thus, this district has a concrete but not overwhelming connection to this litigation. There was a degree of logic to instituting proceedings here, having been an early stop on the 2023 and 2024 tours, because this district was one of the first places where Plaintiffs

---

[63]    I take this admonition from *BCCI Holdings* to refer to the connection between the exercise of jurisdiction in *this district* and Plaintiffs' vindication of their rights, despite that opinion's other holding that I must "examine a defendant's aggregate contacts with the nation as a whole rather than his contacts with the forum state in conducting the Fifth Amendment analysis." 119 F.3d at 947.

[64]    Compl. ¶ 17.

[65]    *Id.* ¶¶ 4–6.

performed and therefore where *ex parte* seizures were likely to occur.[66] And it bears keeping in mind that "[t]here is nothing inherently burdensome about crossing a state line," *BCCI Holdings*, 119 F.3d at 946 (quoting Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, Civil 2d § 1067.1, at 327 (1990)), and so Atlanta—the eighth largest metropolitan area in the country, located near the border of the Eastern and Central time zones, with the world's busiest airport by passenger traffic[67]—may be a relatively convenient place to hold these proceedings.

### iv.    Concerns of Judicial Efficiency and Economy

Lastly, I will consider the concerns of judicial efficiency and economy. It would be plainly *in*-efficient for 35 separate judges to preside over 35 separate cases, one in each district where Plaintiffs are performing. Because the *ex parte*

---

[66] Some might suggest that, given the relative success of Plaintiffs' 2022 case, returning here in 2023 and 2024 was an exercise in forum shopping and convenience. Be that as it may, I believe that, with certain notable exceptions, other district judges would have come to the same conclusions. And the evidence is that many of them have. *See* Zalon, *supra*, at 191.

[67] *See Annual and Cumulative Estimates of Resident Population Change for Metropolitan Statistical Areas in the United States and Puerto Rico and Metropolitan Statistical Area Rankings: April 1, 2020 to July 1, 2024*, U.S. Census Bureau (Mar. 12, 2025), available at: https://www.census.gov/data/tables/time-series/demo/popest/2020s-total-metro-and-micro-statistical-areas.html# v2024 [https://perma.cc/BH89-B6BG]; Marnie Hunter, *Air 'traffic is back': These are the world's 10 busiest airports*, CNN, Apr. 14, 2025, https://www.cnn.com/2025/04/14/travel/worlds-busiest-airports-passengers-2024/index.html [https://perma.cc/2MQX-7N8T].

seizure orders are often accompanied by TROs, for reasons both arguably required by the TCA and developed in practice, *see* Baker, *supra*, at 381, each of these 35 judges would bear "the strain short-fuse emergency orders place on the courts—effectively jumping ahead of hundreds of other pending cases awaiting judicial attention," *Merch Traffic*, 620 F. Supp. 3d at 649. Similarly, requiring Plaintiffs to litigate in multiple districts would most likely subject Plaintiffs to inconsistent rulings, meaning counterfeit merchandise would proliferate at certain concerts but not others. *Compare Merch Traffic*, 620 F. Supp. 3d at 649, *with Plant*, 19 F. Supp. 2d at 1317. In her influential article, Fullerton concludes that the "prevent[ion of] potentially inconsistent judgments," a federal interest underlying the Federal Interpleader Act's grant of nationwide jurisdiction, outweighs the burden on the defendant of litigating in an inconvenient forum. Fullerton, *supra*, at 80. Judicial efficiency and economy are best served if Plaintiffs pursue one case in one district, with one judge deciding whether they have satisfied the TCA's requirements for *ex parte* seizure orders at the appropriate times.

Having considered the relevant factors, I conclude that, on the present record, the federal interest in litigating this dispute in this district outweighs the

burden imposed on the served defendants.[68] Accordingly, the exercise of personal jurisdiction over the served defendants in this district does not offend traditional notions of fair play and substantial justice, and it is therefore consistent with the Fifth Amendment.

### D.    Final Considerations

Finally, I would like to address a few remaining considerations in the interest of bringing these cases to resolution. I have separated those considerations by their respective case.

### 1.    Case No. 1:22-cv-03729

This case was closed in August 2023.  It is unclear from the docket whether Plaintiffs successfully identified any defendant who was served with process and the seizure order in this case. Plaintiffs are **DIRECTED**, within 30 days of this Order, to file a Notice on the docket disclosing the known identities of any defendant so served in this case or alternatively indicating that such information is not available.

### 2.    Case No. 1:23-cv-03516

I previously denied Plaintiffs' motion for default judgment in this case, pending this Order regarding the appropriateness of the exercise of personal

---

[68]    This conclusion is without prejudice to being reevaluated upon a defendant appearing in the case and demonstrating with individually tailored circumstances the burden imposed on that defendant.

jurisdiction over the served defendants.[69] Having concluded that the exercise of personal jurisdiction is appropriate, Plaintiffs are **DIRECTED** to renew their motion for default judgment within 30 days of this Order. Plaintiffs are **ADVISED** that their motion should address the relevant factual considerations and issues raised in this Order and identify the served defendants against whom they are seeking a default judgment.[70]

### 3.    Case No. 1:24-cv-03509

Plaintiffs are **DIRECTED** to move for entry of default against all served defendants within 30 days of this Order.

## III.    Conclusion

I conclude that the exercise of personal jurisdiction in this district over the served defendants is consistent with the Lanham Act, as amended by the Trademark Counterfeiting Act of 1984, as well as the Fifth Amendment.

Plaintiffs are **DIRECTED**, within 30 days of this Order, to file a Notice on the docket in Case No. 1:22-cv-03729 disclosing the known identities of any defendant so served in this case or alternatively indicating that such information is not available.

---

[69]    ECF 25.

[70]    *See* ECF 20, ¶ 5; *see also* Notes 17 & 27, *supra*.

Plaintiffs are further **DIRECTED** to move for default judgment in Case No. 1:23-cv-03516 within 30 days of this Order. The Clerk is **DIRECTED** to add to the docket in Case No. 1:23-cv-03516 the names and addresses of the defendants listed in the table at Paragraph 5 of the document entered at ECF 18-1 in Case No. 1:23-cv-03516; the Clerk should note that some defendants appear more than once.

Plaintiffs are further **DIRECTED** to move for entry of default in Case No. 1:24-cv-03509 within 30 days of this Order.

**SO ORDERED** this 5th day of August, 2025.

Steven D. Grimberg
United States District Judge